AO 91 (Rev. 11/11)  Criminal Complaint

**ORIGINAL**

# UNITED STATES DISTRICT COURT

for the

Central District of California

FILED
CLERK, U.S. DISTRICT COURT

JUN 1 0 2019

CENTRAL DISTRICT OF CALIFORNIA
BY        DC        DEPUTY

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| v. | Case No. **ED19-0329M** |
| ROBERT LEE GILLIAM III, | |
| Defendant. | |

## CRIMINAL COMPLAINT

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about June 8, 2019, in the County of Riverside in the Central District of California, the defendant violated:

| Code Section | Offense Description |
|---|---|
| 8 U.S.C. §§ 1324(a)(1)(A)(ii), and (a)(1)(B)(i) | Transportation of Illegal Aliens for Private Financial Gain |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

_____
*Complainant's signature*

Kimberly R. Christoff, Border Patrol Agent
*Printed name and title*

Sworn to before me and signed in my presence.

Date:  6/10/19

_____
*Judge's signature*

City and state:  Riverside, California

Hon. Shashi H. Kewalramani, U.S. Magistrate Judge
*Printed name and title*

AUSA: Eli A. Alcaraz (951-276-6938)

## **AFFIDAVIT**

I, Kimberly R. Christoff, being duly sworn, declare and state as follows:

### I.  **PURPOSE OF AFFIDAVIT**

1.   This affidavit is made in support of a criminal complaint against Robert Lee GILLIAM III ("GILLIAM") for a violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii), (a)(1)(B)(i) (Transportation of Illegal Aliens for Private Financial Gain).

2.   This affidavit is also made pursuant to 18 U.S.C. § 3144 and in support of the government's motion for designation and detention of six material witnesses (identified below) in connection with a criminal complaint against GILLIAM for a violation of Title 8, United States Code, Sections 1324(a)(1)(A)(ii), (a)(1)(B)(i) (Transportation of Illegal Aliens for Private Financial Gain).

3.   Furthermore, this affidavit is made in support of an application for a warrant to search the following digital device seized from GILLIAM on June 8, 2019, and currently in the custody of United States Border Patrol, in Indio, California, as described more fully in Attachment A to the search warrant application:

a.   A metallic blue Samsung Galaxy S9 in a black case, Serial No. R58KA0N4A9P, IMEI No. 356916/09/128022/9 ("SUBJECT DEVICE").

4.   The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of

Title 8, United States Code, Sections 1324(a)(1)(A)(v)(I),
(a)(1)(B)(i) (Conspiracy to Transport and Harbor Aliens in the
United States); 1324(a)(1)(A)(ii), (a)(1)(B)(i) (Transporting
Illegal Aliens for Private Financial Gain); and
1324(a)(1)(A)(iii), (a)(1)(B)(i) (Harboring Illegal Aliens for
Private Financial Gain) (collectively, the "Subject Offenses"),
as described more fully in Attachment B.  Attachments A and B
are incorporated herein by reference.

    5.   The facts set forth in this affidavit are based upon
my personal observations, my training and experience, and
information obtained from various law enforcement personnel and
witnesses, including my review of reports prepared by other law
enforcement officers and agents.  This affidavit is intended to
show that there is sufficient probable cause for the requested
complaint, material witness designation order, and search
warrant and does not purport to set forth all of my knowledge of
or investigation into this matter.  Unless specifically
indicated otherwise, all conversations and statements described
in this affidavit are related in substance and in part only.

## II. BACKGROUND OF AFFIANT

    6.   I am a graduate of the United States Border Patrol
("USBP") Academy and Federal Law Enforcement Training Center.
As part of my training, I received criminal investigation
training that included course studies in, among other things,
criminal law, immigration law, constitutional law, search and
seizures, and courtroom procedure.

7.    I am currently assigned to the Indio Border Patrol Station ("IDO") as the Central District Prosecution Liaison and I have been employed with USBP since January 10, 2008.  I am responsible for investigating, arresting, and facilitating prosecution of alien smuggling organizations that use the Southern and Central Districts of California as an operational corridor.  I also investigate cases involving narcotic and bulk cash smuggling.

8.    During the course of my employment with USBP, I have participated in alien smuggling investigations that have resulted in federal criminal charges.  In connection with that work, I have made arrests, prepared reports in federal proceedings, and provided sworn statements in federal criminal proceedings.  My work also has included speaking with suspects, cooperating witnesses, and other law enforcement personnel regarding the different methods by which the crime of alien smuggling is committed.

9.    Through my experience, I have gained a working knowledge and insight into the typical workings of criminal alien smuggling organizations.  I also have gained extensive information regarding the normal operational habits of persons who make their living as alien smugglers, including the behavior, speech, routes, and methods of operation of alien smugglers to avoid detection and apprehensions by law enforcement officers.

### III. <u>STATEMENT OF PROBABLE CAUSE</u>

10.  Based on my review of law enforcement reports, conversations with other law enforcement agents, and my own knowledge of the investigation, I am aware of the following:

**A.   Identification of the Target Vehicle**

11.  Generally, a targeting analyst searches for vehicles that travel in a manner inconsistent with normal driving patterns of drivers in the area within similar time frames. When such a vehicle is identified, it is marked for surveillance and enforcement.

12.  On Saturday, June 8, 2019, Supervisory Border Patrol Agent (SBPA) Daniel Brightman identified a vehicle through his targeting-analysis records searches, which was a 2018 Volkswagen Atlas with California license plate 8EMB508 (the "Target Vehicle").  This vehicle was suspected of engaging in smuggling activities based upon the vehicle's travel patterns.

13.  Record checks revealed that the Target Vehicle was driving from San Diego County via eastbound Interstate 8 ("I-8") towards Gila Bend, Arizona, northbound on State Route 85 ("S-85") to westbound Interstate 10 ("I-10") from June 5 to 7, 2019.

  a.  Based on my law enforcement experience and training, I know that this route adds several hours of travel, but it allows a vehicle transporting illicit cargo to avoid passing through any immigration checkpoints, which makes the route attractive to illicit traffickers seeking to avoid detection and arrest by law enforcement authorities.  There are a total of four highways leading to I-10 that could have

4

shortened this particular trip, all of which have Border Patrol checkpoints.

b.   This is also significant because most vehicles traveling from the San Diego area through the Coachella Valley will either cross through the Quartzite Checkpoint located on Highway 95 or the Wellton Checkpoint on I-8 located outside of Yuma, Arizona.  Another logical and direct route of travel for a driver traveling from outside of San Diego, California, to anywhere west of Indio, California on I-10 is to either drive through the Imperial Valley and pass through Indio's Highway 86 or Highway 111, which have Border Patrol Checkpoints, located on both sides of the Salton Sea.  These immigration checkpoints are strategically situated to interdict undocumented aliens and narcotics being smuggled and trafficked most frequently from the border areas of western Arizona and southern California.  The fact that the Target Vehicle did not have any record passing through any immigration checkpoint indicated to SBPA Brightman that the Target Vehicle was intentionally circumventing the immigration checkpoints.

14.  On June 8, 2019, the Target Vehicle traveled south through Brawley, California, which is approximately 1 hour 30 minutes away from Blythe, California, via Highway 78, which a more direct route.  However, on that day, the Target Vehicle drove south to Interstate 8.  Then it drove east on Interstate 8 to Arizona State Route 85.  On Arizona State Route 85, it went north to Interstate 10 where it traveled west to Blythe,

California, through the Interstate 10 Agriculture Inspection Station checkpoint.

       a.   That particular route of travel takes approximately 5 hours.  It is highly unusual for the motoring public to travel in such a roundabout manner.

       b.   Since March of 2019, I-10 has seen a dramatic increase in alien smuggling events.  Between March of 2019 and June of 2019, several alien smuggling events were interdicted on I-10 by El Centro and Yuma Border Patrol agents.  This is likely due to the fact that the I-8 westbound checkpoint, operated by the Campo Border Patrol Station, and the Highway 86 State Route 2, and the Highway 111 Checkpoints, operated by the Indio Border Patrol Station, have remained operational, thus forcing illicit traffic to discover and utilize routes with less law enforcement presence.  In addition, these immigration checkpoints are strategically situated to interdict undocumented aliens and narcotics being smuggled and trafficked most frequently from the border areas of western Arizona and southern California. Smugglers use I-10 in order to avoid inspection at these checkpoints, in an effort to avoid detection and arrest by law enforcement authorities.

   15.   SBPA J. Saracco conducted a registration and law enforcement information systems check on the Target Vehicle, which revealed that it was registered to "EAN Holdings," a known rental company.  This information was relayed to SBPA Brightman, and Robert Raymer and Thong Do, Agents with U.S. Border Patrol Agents ("BPA").

a.   Individuals often smuggle illegal aliens and narcotics in rental vehicles because they know if they were to be arrested in the act utilizing their personally owned vehicle, seizure and forfeiture of the vehicle would be imminent.

**B.   Further Investigation of the Target Vehicle**

16.   Indio Station Border Patrol Agents assumed highway interdiction operations in an effort to conduct surveillance on the Target Vehicle.

a.   At approximately 5:00 p.m., SBPA Brightman, and BPAs R. Raymer and T. Do initiated surveillance on I-10 westbound in Indio, California, a few miles east of Dillon Road in their marked Border Patrol units.  This area is approximately 93 miles from the Mexico border when driving directly.

b.   SBPA John Saracco positioned himself several miles west on I-10 near the Washington Street exit with a tire deflation device in the event a failure to yield pursuit occurred.

17.   At 5:45 p.m., SBPA Brightman observed the Target Vehicle pass his marked Border Patrol unit driving in the left lane of I-10 westbound.

18.   SBPA Brightman began following the Target Vehicle, and once he was driving behind the Target Vehicle, SBPA Brightman observed a decrease in speed of approximately 10 to 15 miles per hour.  After the Target Vehicle slowed down, it was now driving much slower than the posted speedy limit of 70 miles per hours.

a.   Based on SBPA Brightman's law enforcement experience, this was not the typical reaction of the motoring

public when they observe Border Patrol on the roads because most individuals in the border region know that Border Patrol agents do not enforce state traffic laws.

19.  SBPA Brightman pulled along the passenger side of the Target Vehicle in an attempt to view the number and demeanor of the occupants of the Target Vehicle.  SBPA Brightman observed, through the passenger window of the Target Vehicle, the front passenger staring straight forward.  The driver looked over at SBPA Brightman.  Now driving slightly in front of the Target Vehicle, but still on the passenger side, SBPA Brightman looked back at the Target Vehicle through its windshield and again could see the driver looking towards SBPA Brightman's marked Border Patrol vehicle and the front passenger looking straight ahead.  At this time, SBPA Brightman could also see two individuals sitting in the row of seats behind the front driver and passenger.  SBPA Brightman slowed his vehicle to the point where again he was looking through the passenger window of the Target Vehicle.  At this point, both the driver and front passenger were looking straight ahead and avoiding eye contact or looking at the marked Border Patrol unit.

a.  Based on SBPA Brightman's training and experience, it is uncommon for an individual in one vehicle to not look over to another vehicle on the side of it while driving, especially when the vehicle to the side is making an effort to stay aligned with it while driving for an extended period of time.  This behavior is consistent with an individual who is attempting avoid any contact with law enforcement.

20.  The information about the front passenger's unusual behavior, and the clear deceleration of the Target Vehicle was relayed to BPAs T. Do and R. Raymer via the service radio.

**C.   Roving Stop and the Discovery of Undocumented Aliens**

21.  BPA Do initiated a vehicle stop and the Target Vehicle yielded on the northern shoulder of Interstate 10 Westbound just east of the Golf Center Parkway exit.

22.  SBPA Brightman parked in front of the Target Vehicle on the shoulder of the highway and BPA Do was positioned behind it.  While BPA Do was advising dispatch of the vehicle stop, SBPA Brightman approached the vehicle from the front.  SBPA Brightman identified himself as a Border Patrol Agent and asked the driver, later identified GILLIAM, to state his citizenship. GILLIAM replied that he was a U.S. citizen.

a.   While approaching the Target Vehicle and asking that question, SBPA Brightman observed GILLIAM's hands go from the steering wheel to his lap, to the steering wheel and back to his lap.  His quick movements appeared as if he did not know what to do with his hands.

23.  SBPA Brightman asked GILLIAM for identification. GILLIAM checked his pockets by patting them, then reached for the area in front of the gear shifter and below the radio to grab his wallet.  GILLIAM reached into his wallet and pulled from it a California driver's license.

a.   SBPA Brightman observed GILLIAM's hand was noticeably shaking when he handed the identification over.

24.   SBPA Brightman asked GILLIAM to turn off the car and give him the keys.  GILLIAM stated the car was off and that the car had no keys.  SBPA Brightman told GILLIAM the car does have keys and asked again for him to hand them over.  GILLIAM replied quickly as if it just occurred to him, "the keys are in my pocket."  GILLIAM complied and handed SBPA Brightman the keys.

25.   SBPA Brightman saw three passengers sitting in the row directly behind the front seats.  Suddenly, the one of the passengers, later identified as Bernardo Lopez-Gonzalez, sitting on the passenger side of that row opened the door and exited the vehicle.  SBPA Brightman immediately ordered Lopez to re-enter the vehicle and stay seated.  Lopez complied without further incident.

26.   SBPA Brightman questioned the front passenger, later identified as Eduardo Barajas-Duran, in the Spanish language as to what country he was a citizen of.  Barajas-Duran replied that he was a citizen of Mexico.  When asked if he had any immigration documents to be in the U.S. legally, Barajas-Duran replied, "No."

27.   SBPA Brightman asked GILLIAM to exit the vehicle. GILLIAM attempted to grab his belongings.   SBPA Brightman instructed him to leave everything and exit the car.  SBPA Brightman signaled to BPA T. Do that GILLIAM was to be placed under arrest.  BPA T. Do took custody of GILLIAM at the rear of the Volkswagen Atlas and informed him he was under arrest.  BPA T. Do searched GILLIAM and escorted him to his patrol vehicle. When they got to the patrol vehicle, BPA T. Do explained to

GILLIAM that he was under arrest for smuggling aliens.  GILLIAM responded that he picked up the passengers on the side of the road and was simply giving them a ride.

28.  SBPA Brightman went to the front passenger side of the vehicle and told Barajas-Duran to exit vehicle and informed him that he was under arrest.  BPA Raymer escorted Barajas-Duran to the back of a Border Patrol vehicle.

29.  SBPA Brightman opened the back passenger door and asked the passenger, later identified as Bernardo Lopez-Gonzalez, what country he was a citizen of in the Spanish language.  Lopez-Gonzalez stated, "Mexico."  When asked if he had any immigration documents to be in the U.S. legally, Lopez-Gonzalez replied, "No."  SBPA Brightman advised him that he was under arrest and BPA Raymer escorted him to the back of a Border Patrol vehicle.

30.  The individual sitting in the middle of that row, later identified as Roberto Diaz-Rios, told SBPA Brightman when asked in the Spanish language that he was a citizen of Mexico without immigration documents to be in the U.S. legally.  SBPA Brightman advised him that he was under arrest and BPA Raymer escorted him to the back of a Border Patrol vehicle.

31.  The individual sitting on the left side of the row behind the front seats, later identified as Jose Barajas-Duran, told SBPA Brightman when asked in the Spanish language that he was a citizen of Mexico without immigration documents to be in the U.S. legally.  SBPA Brightman advised him that he was under

arrest and BPA Raymer escorted him to the back of a Border Patrol vehicle.

32.   The individual sitting on the left side of the rear row, later identified as Eliseo Rodriguez-Diaz, told SBPA Brightman when asked in the Spanish language that he was a citizen of Mexico without immigration documents to be in the U.S. legally.   SBPA Brightman advised him that he was under arrest and BPA Raymer escorted him to the back of a Border Patrol vehicle.

33.   The individual sitting on the right side of the rear row, later identified as Sergio Montalvo-Cantu, told SBPA Brightman when asked in the Spanish language that he was a citizen of Mexico without immigration documents to be in the U.S. legally.   SBPA Brightman advised him that he was under arrest and BPA Raymer escorted him to the back of a Border Patrol vehicle.

34.   All occupants and the Target Vehicle were transported to the Indio Border Patrol Station in Indio, California, for further interviewing and processing.

**D.    Border Patrol Agents interview GILLIAM**

35.   On Saturday, June 8, 2019, at approximately 8:37 p.m., GILLIAM was read his Miranda rights. GILLIAM indicated that he understood his rights and he was willing to speak to the agents outside the presence of a lawyer.

36.   GILLIAM stated that an adult male named "Mike" approached him at the gym he works in approximately 2 months ago.   Mike told GILLIAM that he knows someone that goes by

"Borgado" that offers jobs to pick up illegal aliens and transport them north.  GILLIAM contacted "Borgado" and was offered $500 plus expenses to pick up the illegal aliens and to transport them north. GILLIAM was instructed by "Borgado" to get a rental vehicle, which GILLAM's mother rented for him, and go to El Centro, California.  Once he arrived in El Centro, GILLAM got an address in Calexico, California where there was a Carl's Jr, a Rite Aid, and a Walmart all in one shopping center. There, a newer model grey Chevrolet sedan parked next to GILLIAM and transferred three illegal aliens into his vehicle.

37.  GILLIAM was then given instructions to go to the Imperial Valley Mall and park to the side of the Macy's department store in El Centro, California.  An older model pickup truck with a camper shell attached to it parked next to GILLIAM.  Three more illegal aliens exited from the bed of the pickup truck and entered GILLIAM's vehicle.  GILLIAM was then instructed to drive to Yuma, Arizona; Gila Bend, Arizona; and then towards Blythe, California.  GILLIAM claimed that he was instructed to take that long route because he would be avoiding Border Patrol Checkpoints.  GILLIAM was then given an address in Palm Desert, California.  If he would have arrived at that location, he would then be given his final address where he would transfer the illegal aliens to another person.

38.  GILLIAM claimed that he had done this once before, picking up three illegal aliens and using the same route of travel.  At that time, GILLIAM took the illegal aliens to a gas station in Fontana, California, where an older model black

Toyota Corolla being driven by a female took the illegal aliens from GILLIAM and paid him the $500 plus $300 for expenses.

39.   GILLIAM stated that he also recruited his friend Bobby and his mother.  He told both of them to contact "Borgado" for work and that the job involved picking up illegal aliens. GILLIAM accepted.

**E.   Interviews with Material Witnesses**

40.   BPAs interviewed the potential material witnesses. Throughout the interviews, agents used the same photographic lineup when asking the witnesses to identify their transporter.

a.   The photo line-up labeled 1A depicts GILLIAM in photograph no. 4.

41.   As more fully set forth below, each witness gave information about how they came into the United States and who transported them.  Accordingly, based upon my experience and training, I believe that the testimony of Bernardo Lopez-Gonzalez, Roberto Diaz-Rios, Jose Roberto Barajas-Duran, Eliseo Rodriguez-Diaz, Sergio Montalvo-Cantu, and Eduardo Salvador Barajas-Duran is required to establish that: (1) each had entered into, and remained within the United States unlawfully; (2) each were assisted by others, including the defendant, in seeking to enter the United States unlawfully and be transported therein once across the border; (3) they paid or were going to pay money for the service of being smuggled across the United States/Mexico border and be provided transportation within the United States subsequent to their illegal entry; (4) defendant provided them transportation within the United States; and

(5) defendant was aware of their status as unlawful aliens within the United States.

### 1.   Material Witness 1: Lopez-Gonzalez

42.   At approximately 12:34 a.m., on June 9, 2019, Lopez-Gonzalez was placed under oath and gave a sworn statement to the agents.  The sworn statement was conducted in the Spanish language.  Below is a summary of the information Lopez-Gonzalez provided:

43.   LOPEZ left his house in Chapas, Mexico on May 31, 2019.  LOPEZ took a bus from Chapas to Mexicali, Mexico and arrived on June 4, 2019 at approximately 10:00 AM.  LOPEZ claims that his friend Juan Carlos made arrangements for him.  When LOPEZ arrived in Mexicali, Mexico a Nissan 4 door sedan was waiting for him driven by an adult Hispanic male.  They drove for approximately 30 minutes before arriving at a house on the edge of Mexicali, Mexico.  In that house, LOPEZ claims that the house is used to hold people waiting to cross illegally into the United States but that it was currently empty.  LOPEZ waited there approximately one week until he was taken to another house approximately 15 minutes away by car.  There he met up with two other individuals who were also the other passengers detained by Border Patrol in connection with this smuggling incident.  The next day, LOPEZ and the other two subjects were taken into the desert by three unknown adult males and walked approximately 45 minutes before arriving at the international border.

44.   LOPEZ stated that a ladder was placed on the border fence to help him and the others get over it.  One of the three

guides crossed over the fence with LOPEZ and they walked approximately nine hours until they arrived at a dirt road. A brown SUV driven by a Hispanic adult male arrived at the same time as they did.  LOPEZ and the other two entered the vehicle but the guide stayed behind.  They were then taken to a house approximately 30 minutes away where they dropped off LOPEZ and the other two were taken to different house.  At the house, LOPEZ met up with the other three individuals who were later also detained in this smuggling incident.  The next day, the four of them were picked up by the vehicle in which they were arrested in.  From there, they went to another house and picked up the two individuals that got separated from LOPEZ the day prior.  LOPEZ stated that they left that house at approximately 11:00 AM on June 8, 2019, and that he felt the trip was extremely long before getting arrested and detained by Border Patrol.

45.  LOPEZ did not identify anyone from the photo lineup.

2.  <u>Material Witness 2: Diaz-Rios</u>

46.  At approximately 10:24 p.m., on June 8, 2019, Diaz-Rios was placed under oath and gave a sworn statement to the agents. The sworn statement was conducted in the Spanish language. Below is a summary formation Diaz-Rios provided:

47.  DIAZ left his home in Oaxaca, Mexico, on June 3, 2019. DIAZ took a bus to Mexicali, Mexico with his friend Eliseo (Rodriguez-Diaz) and arrived on June 5, 2019, at approximately 4:00 PM.  DIAZ began asking around the bus station if they could get help to cross into the United States Illegally.  DIAZ and

Eliseo eventually left and rented a room at a house in Mexicali, Mexico for 2 nights until they could find someone to help them. DIAZ had left his phone number with an older Hispanic male that he met at the bus station and promised to call DIAZ if he could help him cross.   That man called DIAZ and told him and Eliseo to walk a few blocks away from where DIAZ was staying and wait for him.   The man showed up in a taxi and spoke with DIAZ and Eliseo about payment.   DIAZ agreed to pay $7,000 once he successfully makes it to Los Angeles, California.   The man called another taxi to pick them up.

48.   DIAZ and Eliseo were taken to the edge of Mexicali, Mexico, Mexico and met up with Sergio (Montalvo-Cantu), who was also going to cross into the United States illegally, and began to walk north towards the international border.   They walked for approximately five hours until arriving at the international border.   The man told them to jump the border fence and run north.   They were told they were going to arrive at a city and wait there until they got picked up.   DIAZ stated that they ran for approximately three hours after jumping the border fence. They arrived at a dirt road near a city and a vehicle was waiting for them.   An unknown male told DIAZ and the other two to get inside his vehicle.   They all entered the vehicle and they were told to hide.   They drove for approximately one and a half hour before stopping near a house.   There they were told to go inside and rest.   DIAZ stated that there was no one else at the house but that the door was unlocked.   They stayed for one night and were contacted by phone the next day.   Sergio was the

one with the cell phone and they were instructed to exit the
house because someone was waiting for them.

49.  A white SUV driven by a bearded older male was waiting
outside and they entered his vehicle.  DIAZ sat in the back seat
in the middle with the other two beside him.  They drove for
approximately three hours before stopping again near some
houses. There, three other subjects entered the vehicle.  From
there they continued to drive but were eventually arrested by
Border Patrol.

50.  DIAZ identified photograph number 4 "GILLIAM" from
photo lineup 1A as being the driver of the vehicle in which they
were arrested in.

### 3.   Material Witness 3: Jose Roberto Barajas-Duran

51.  At approximately 2:10 a.m., on June 9, 2019, Barajas-
Duran, J. was placed under oath and gave a sworn statement to
the agents. The sworn statement was conducted in the Spanish
language. Below is a summary of the information Barajas-Duran,
J. provided:

52.  BARAJAS, J. left his home in Mohican, Mexico, on May
30, 2019.  BARAJAS, J. took a plane with his brother Eduardo to
Tijuana, Mexico and arrived the same day.  BARAJAS, J. and
BARAJAS, E.  went looking for a smuggler to help them cross
illegally into the United States.  BARAJAS found an older
Hispanic male adult and was told that he could help BARAJAS and
his brother for $6,500 each upon arriving in Los Angeles,
California.  BARAJAS agreed.  From there, they were taken to a
house in Tijuana, Mexico where they were holding people waiting

to be smuggled into the United States.  BARAJAS stated that they waited until June 1, 2019 and were taken to where they were going to cross into the United States but for whatever reason the smugglers decided not to cross them yet.  From there, BARAJAS and his brother decided not to use those smugglers anymore and went to the bus station and traveled to Mexicali, Mexico.  There in Mexicali, Mexico, they asked a taxi driver if he knew any smugglers.  The taxi driver said he did know someone and so he took BARAJAS and his brother to a nearby house.  At the house, BARAJAS met with the smugglers there and agreed to pay $7,500 each for their help.  From there they were taken to another house nearby.  They waited in that house until June 7, 2019 and were then taken to the desert outside of Mexicali, Mexico.

53.  BARAJAS stated that he and his brother were guided by one unknown male through the desert and walked approximately seven hours before arriving at the international border.  All three went over the border fence and walked approximately seven more hours.  At that point, the guide separated from BARAJAS and his brother and only gave vague directions on where to go from there.  BARAJAS walked approximately two hours until they arrived at a dirt road.  Shortly afterwards, a brown SUV arrived and BARAJAS and his brother entered the vehicle.  They drove approximately two hours before arriving at a house.  BARAJAS claimed that he only saw one other adult male in the house who he thinks was working for the smugglers but later that day, they dropped off one of the other individuals who later detained with

BARAJAS in this event.  They stayed there for one day and were then picked up by a white SUV, which already had the other three individuals that were later detained with BARAJAS in this event. The SUV was driven by a tall adult male.  They drove for hours until only stopping once to fuel up until they got arrested by the Border Patrol.

4.    Material Witness 4:  Rodriguez-Diaz

54.  At approximately 9:47 p.m., on June 8, 2019, Rodriguez-Dias was placed under oath and gave a sworn statement to the agents. The sworn statement was conducted in the SPanidh language. Below is a summary of the information Rodriguez-Dias provided:

55.  RODRIGUEZ is a citizen of Mexico, and has never had or possessed any immigration documents to be legally present in the United States.  RODRIGUEZ has been previously deported from the United States.

56.  RODRIGUEZ stated he left his hometown of Ejucla de Crespo, Oaxaca, Mexico, on Monday, June 3, 2019, by bus and arrived to Mexicali, Mexico three days later. RODRIGUEZ stated he made this journey with his friend Roberto DIAZ, who was also arrested on today's event. RODRIGUEZ stated once they arrived to Mexicali, Mexico, they met another individual named Sergio Montalvo at the bus station. RODRIGUEZ stated they all booked a hotel for the next two night. RODRIGUEZ stated they did not make any smuggling arrangements. RODRIGUEZ stated on Friday morning (June 7, 2019) they all walked to a store nearby and an unknown subject told them that he could take them near the border fence.

RODRIGUEZ stated this subject took the three of them to an area near the border where there is no border fence only barriers that look like X's.

57.   RODRIGUEZ stated the subject told them to walked straight north. RODRIGUEZ stated they walked for approximately six (6) hours until they reached a two way highway. RODRIGUEZ stated he saw a vehicle coming and he signaled the driver to stop. RODRIGUEZ stated the vehicle was a 4 door sedan driven by a male subject in his 50s. RODRIGUEZ stated the driver of the sedan was wearing glasses. RODRIGUEZ stated he asked the driver if he could help them. RODRIGUEZ stated the driver agreed. RODRIGUEZ stated they were in the vehicle for only 40 minutes until the driver told them that he couldn't help them anymore. RODRIGUEZ stated the driver left them on the side of the road.

58.   RODRIGUEZ stated they stayed there until this morning until they walked to the nearest town. RODRIGUEZ stated they asked for help for approximately five hours. RODRIGUEZ stated while walking on an unknown road they met a subject who agreed to take them further north. RODRIGUEZ stated this subject drove for approximately 30 minutes until he stopped and three more subjects got in the vehicle with them. RODRIGUEZ stated he was sitting on the back area of the vehicle. RODRIGUEZ stated he fell asleep and cannot recall anything else until they all got pulled over by Border Patrol.

59.   RODRIGUEZ stated he was not going to pay the driver anything.

60.   RODRIGUEZ stated he feared for his life while being in the vehicle because he did not know the mental condition of the driver or if he was driving under the influence.

61.   RODRIGUEZ was presented with a six pack photo line-up (1A).

62.   RODRIGUEZ thinks, but he is not sure, that photograph number 4 (GILLIAM) is the driver of the vehicle in which he got arrested.

63.   RODRIGUEZ's statements appeared to be untruthful and fabricated.

5.   Material Witness 5: Montalvo-Cantu

64.   At approximately 12:11 a.m., on June 9, 2019, Montalvo-Cantu was placed under oath and gave a sworn statement to the agents.  The sworn statement was conducted in the Spanish language. Below is a summary of the information Mantalvo-Cantu provided:

65.   MONTALVO is a citizen of Mexico, and has never had or possessed any immigration documents to be legally present in the United States.  MONTALVO has never been arrested or deported from the United States.

66.   MONTALVO stated he is originally from Acapulco, Guerrero, Mexico, but has been residing in Mexicali, Mexico for the past four months. MONTALVO stated he used to work at a water treatment plant in Mexicali, Mexico. MONTALVO stated on Friday, June 7, 2019, after work he went to downtown Mexicali, Mexico and met with a smuggler named "Paisa." MONTALVO stated "Paisa" was going to charge him $5,000 upon arriving to Madera,

California. MONTALVO stated he was going to go to Madera,
California to work at the grape farms. MONTALVO stated after
agreeing with "Paisa" they both went to "Paisa's" house.
MONTALVO stated once he arrived at "Paisa's" house he met
Roberto (DIAZ-Rios) and Eliseo (RODRIGUEZ-Diaz, Eliseo), two of
the individuals he was arrested with by the Border Patrol.

67.   MONTALVO stated after being in "Paisa's" house for a
little while, they were taken to a location in the desert in
Mexicali, Mexico near the border fence. MONTALVO stated after
climbing over the border fence, they were instructed to walk
north until reaching a dirt road where someone was going to pick
them up. MONTALVO stated while walking north they ran into
another group of three undocumented aliens (UDAs). MONTALVO
stated they all walked together until they reached a dirt road.
MONTALVO stated they all got picked up by a gray SUV driven by a
young unknown driver. MONTALVO stated the three UDAs they found
while walking in the desert got dropped off at an unknown house.

68.   MONTALVO stated that he, Roberto and Eliseo were taken
to a different house. MONTALVO stated they stayed there
overnight. MONTALVO stated "Paisa" had previously told him a
vehicle was going to come and pick them up. MONTALVO stated on
Saturday, June 8, 2019, in the morning, a white vehicle came to
the house and honked its horn. MONTALVO stated they all got in
the white vehicle.  This was the same vehicle he was arrested
later on.  MONTALVO stated the driver then drove to another
house and picked up the other three UDAs that he had previously
met.

69.   MONTALVO stated he was in the white vehicle for few hours later until they got arrested by the Border Patrol. MONTALVO stated he was sitting on the third row of the vehicle next to Eliseo.

70.   MONTALVO stated he did not fear for his life while being inside the vehicle.

71.   MONTALVO was not able to identify anyone from photo lineup 1A.

### 6.   Material Witness 6: Eduardo Salvador Barajas-Duran

72.   At approximately 1:21 a.m., on June 9, 2019, Barajas—Duran, E. was placed under oath and gave a sworn statement to the agents.  The sworn statement was conducted in the Spanish language.  Below is a summary of the information Barajas-Duran, E. provided:

73.   BARAJAS, E. is a citizen of Mexico, and has never had or possessed any immigration documents to be legally present in the United States.  BARAJAS, E. has been previously arrested by United Stated Border Patrol.

74.   BARAJAS, E. stated him and his brother (Jose Roberto BARAJAS-Duran) left their hometown in Los Reyes, Michoacán on May 30, 2019. BARAJAS, E. stated they boarded an airplane and arrived to Tijuana, Mexico on the same date. BARAJAS stated once they arrived to Tijuana, Mexico they attempted to cross illegally into the United Stated but got arrested by Border Patrol near Tijuana, Mexico. BARAJAS stated after they were sent

back to Tijuana, Mexico they decided to try through Mexicali, Mexico.

75.  BARAJAS, E. stated they arrived in Mexicali, Mexico on June 4, 2019. BARAJAS, E. stated they made smuggling arrangements with a subject named "Paisa." BARAJAS, E. stated "Paisa" was going to charge him $7,000 USD each upon arriving to Los Angeles, California. BARAJAS stated they stayed on "Paisa" for the next three (3) nights. BARAJAS, E. said they were moved to different house.

76.  BARAJAS stated that on Friday, June 7, 2019, they were taken to an unknown area in the desert of Mexicali. BARAJAS stated they climbed over the border fence without using any devices. BARAJAS stated once in the United States, five other UDAs and a foot guide joined them. BARAJAS, E. stated they all followed the foot guide for the next six or seven hours. BARAJAS, E. stated they all got picked up by a light brown SUV driven by a young unknown individual. BARAJAS, E. stated he does not know where the foot guide went.

77.  BARAJAS, E. stated the driver first dropped off three (3) UDAs in a house. BARAJAS, E. stated the driver then dropped off one (1) UDA in another house. BARAJAS, E. stated he and his brother were finally dropped off in another house. BARAJAS, E. stated later on the single UDA dropped off by himself came to the house they were in.

78.  BARAJAS, E. stated that on Saturday, June 8, 2019, the three of them were picked up by a white SUV driven by a dark skin male subject with a mustache. BARAJAS, E. stated the three

(3) UDAs previously noted were inside the white SUV already. BARAJAS, E. stated he was sitting in the front passenger seat right next to the driver. BARAJAS, E. stated the driver tried to communicate with them but he could not do so because he only spoke English.

79.   BARAJAS, E. stated he did not fear for his life while being inside the white SUV.

80.   BARAJAS was presented with a six pack photo line-up (1A).

81.   BARAJAS, E. identified photograph number 4 (GILLIAM) as the driver of the vehicle before they were stopped by the Border Patrol.

### IV. <u>**TRAINING AND EXPERIENCE ON ALIEN SMUGGLING**</u>

82.   Based on my experience and training, I am familiar with the methods employed in smuggling operations and the smuggling patterns employed by such organizations.  I have also spoken with other experienced agents and other law enforcement officers about their experiences and the results of their investigations and interviews.  I have become familiar with the methods of operation typically used by alien smugglers.  Based on my training, experience, my conversations with other law enforcement officers, and my knowledge of this investigation and others, I am aware of the following:

a.   Alien smuggling is generally a continuing criminal activity taking place indefinitely unless interrupted by law enforcement action.  Indeed, based on my training and experience, individuals who have established an income based on

26

smuggling tend to continue the activity for prolonged periods of time because that is how they make a living.

b.    Alien smugglers often use one or more telephones, pagers, or other digital devices, sometimes in fictitious and/or other individuals' names, to communicate with other participants in their smuggling operations, including co-conspirators and customers, regarding matters such as price, arrival time, and meet location.  This communication can occur by phone, text, email, or social media.  Alien smugglers maintain in such devices telephone and other contact information which reflects names, addresses, and/or telephone numbers of their associates in the alien smuggling organization, as well as customers of the alien smuggling business.  Further, alien smugglers will also use text messages to send photographs as codes or actual pictures or videos.  I know that the above-described information can be stored on digital devices carried by alien smugglers.

c.    In addition, I know that professional smuggling operations depend upon maintaining both long-distance and local contacts with individuals in the source country who arrange the initial payment and embarkation, as well as those in the United States who facilitate arrival and collection of any remaining smuggling fees.  Smugglers often use fraudulent information to subscribe to cellular telephones, maintain separate customer and supplier telephones, and frequently change cellular telephones to thwart law enforcement efforts to intercept their communications.  Smugglers frequently use pre-

paid telephones and/or false or misleading subscriber information as a way of distancing themselves from criminal liability.

  d. Individuals involved in human smuggling commonly obtain partial payment from customers prior to embarkation, and accept the remaining payment upon safe arrival in the United States.  Therefore, I am aware that individuals involved in human smuggling maintain books, customer lists, receipts, notes, ledgers, and other records relating to the negotiated price for a customer and any partial payments made or due, and that such documents may be in code to attempt to thwart law enforcement detection.

  e. Smugglers keep records of their illegal activities for a period of time extending beyond the time during which they actually transport a particular customer, in order to maintain contact with criminal associates for future smuggling operations, and to have records of prior transactions for which, for example, they might still be owed payment, or might owe someone else money

  f. Alien smugglers frequently use Global Positioning System ("GPS") devices to navigate.  I know that GPS devices often store route history information of previously travelled routes.

  g. Data contained on digital devices used by smugglers often include, among other things, records of telephone calls, text messages, e-mail and social media communications between the smugglers and the co-conspirators;

Global Positioning System ("GPS") information and other location information that can help identify embarkation and landing locations, meeting places, and smuggling routes; and identifying information about the smuggler and co-conspirators, such as contact lists, calendar appointments, and photographs or videos.

## V. <u>TRAINING AND EXPERIENCE ON DIGITAL DEVICES</u>

83. As used herein, the term "digital device" includes the SUBJECT DEVICE.

84. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

a. Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

b. Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has

been responsible for creating or maintaining records, documents, programs, applications, and materials on the device.  That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them.  For example, recoverable data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

c.   The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

d.   Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

85.  Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it is not always possible to search devices for data during a search of the premises for a number of reasons, including the following:

     a.   Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which may take substantial time, particularly as to the categories of electronic evidence referenced above.

     b.   Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

86.  The search warrant requests authorization to use the biometric unlock features of a device, based on the following, which I know from my training, experience, and review of publicly available materials:

     a.   Users may enable a biometric unlock function on some digital devices.  To use this function, a user generally displays a physical feature, such as a fingerprint, face, or eye, and the device will automatically unlock if that physical feature matches one the user has stored on the device.  To unlock a device enabled with a fingerprint unlock function, a user places one or more of the user's fingers on a device's fingerprint scanner for approximately one second.  To unlock a device enabled with a facial, retina, or iris recognition function, the user holds the device in front of the user's face with the user's eyes open for approximately one second.

31

b.    In some circumstances, a biometric unlock function will not unlock a device even if enabled, such as when a device has been restarted or inactive, has not been unlocked for a certain period of time (often 48 hours or less), or after a certain number of unsuccessful unlock attempts.  Thus, the opportunity to use a biometric unlock function even on an enabled device may exist for only a short time.  I do not know the passcodes of the devices likely to be found in the search.

c.    The person who was in possession of a device or had the device among his or her belongings is likely a user of the device.  Thus, the warrant I am applying for would permit law enforcement personnel to, with respect to any device that appears to have a biometric sensor and falls within the scope of the warrant: (1) depress GILLIAM's thumb- and/or fingers on the SUBJECT DEVICE; and (2) hold the SUBJECT DEVICE in front of GILLIAM's face with his or her eyes open to activate the facial-, iris-, and/or retina-recognition feature.

87.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VI. <u>CONCLUSION</u>

88.  For all of the reasons described above, there is probable cause to believe that GILLIAM has committed a violation of 8 U.S.C. §§ 1324(a)(1)(A)(ii), (a)(1)(B)(i) (Transportation of Illegal Aliens for Private Financial Gain).

89.  Furthermore, there is probable cause to believe that evidence, fruits, and instrumentalities of the Subject Offenses

will be found on the SUBJECT DEVICE as described above and in Attachment A.

90.   Finally, for all the reasons described above, there is sufficient facts to establish that the testimony of witnesses Bernardo Lopez-Gonzalez, Roberto Diaz-Rios, Jose Roberto Barajas-Duran, Eliseo Rodriguez-Diaz, Sergio Montalvo-Cantu, and Eduardo Salvador Barajas-Duran are material in a criminal proceeding and that they should be designated and detained as material witnesses pursuant to 18 U.S.C. § 3144 (Release or detention of a material witness).

KIMBERLY R. CHRISTOFF
U.S. Border Patrol Agent

Subscribed to and sworn before me
this  10TH  day of June, 2019.

UNITED STATES MAGISTRATE JUDGE
SHASHI H. KEWALRAMANI